08 CV 5578

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

DENISE A. TUTTLE, On Behalf of Herself and All
Others Similarly Situated,

                                  Plaintiff, :

                   vs.

WACHOVIA CORPORATION, JOHN D. BAKER,
II; PETER C. BROWNING; JOHN T. CASTEEN,
III; JEROME A. GITT; WILLIAM H. GOODWIN,
JR.; MARYELLEN C. HERRINGER; ROBERT A.
INGRAM; DONALD M. JAMES; MACKEY J.
MCDONALD; JOSEPH NEUBAUER; TIMOTHY
D. PROCTOR; ERNEST S. RADY; VAN L.
RICHEY; RUTH G. SHAW; LANTY L. SMITH; G.
KENNEDY THOMPSON; DONA DAVIS YOUNG;
BENJAMIN J. JOLLEY; SHANNON MCFAYDEN;
and JOHN and JANE DOES 1-40,

                            Defendants. :

---------------------------------------------------------------- x

Case No. _____

**CLASS ACTION COMPLAINT**

**AND DEMAND FOR JURY TRIAL**



Plaintiff Denise A. Tuttle ("Plaintiff"), on behalf of the Wachovia Savings Plan (the "Plan") and a class of similarly situated participants ("Participants") in the Plan during the proposed Class Period (defined below), alleges as follows:

## I.    INTRODUCTION

    1.    Plaintiff brings this class action pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1109, 1132 against the fiduciaries of the Wachovia Savings Plan (the "Plan") on behalf of the participants in the Plan for losses to the Plan caused by Defendants' breaches of fiduciary duty. The "Class Period" is from May 8, 2006 through the present.

2.      Plaintiff was employed with Wachovia Corporation ("Wachovia" or the "Company") and was a participant in the Plan during the Class Period, during which time the Plan held interests in the Company's common stock. Plaintiff's retirement investment portfolio in the Plan during the Class Period included Company stock. Plaintiff brings this action on behalf of all similarly situated Plan participants for the benefit of participants and the Plan.

3.      At all relevant times, Defendants were and are "fiduciaries" of the Plan as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Defendants breached their duties to Plaintiff and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a), 405, 29 U.S.C. §§ 1104(a), 1105, particularly with regard to the Company's heavy holdings of Company stock. During the Class Period, Defendants issued materially false and misleading statements regarding the Company's business and financial results; concealed, distorted and misrepresented the Company's true financial condition, thereby precluding Plan participants from properly assessing the prudence of investing in Company stock; failed to prudently and loyally manage Plan assets; failed to provide complete and accurate information to Plan participants; violated ERISA's prohibition against conflicts of interest; and failed to adequately monitor other Plan fiduciaries and to provide them with complete and accurate information.

4.      As a result of Defendants' breaches of fiduciary duty, Plan participants, who invested their retirement savings in Company stock, suffered millions of dollars in losses.

## II.     JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

6.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan was administered in this district, some or all of the fiduciary

breaches for which relief is sought occurred in this district and, on information and belief, the Company's principal place of business is in this district.

## III.    PARTIES

### A.    Plaintiff

7.    Plaintiff Denise A. Tuttle is a "participant," within the meaning of § 3(7) of ERISA, 29 U.S.C. § 1102(7), in the Plan and held shares of Company stock in her retirement investment portfolio during the Class Period.

### B.    Defendants

#### 1.    Wachovia

8.    Defendant Wachovia is the fourth-largest bank in the United States. Wachovia describes itself as a diversified financial services company that provides a broad range of retail banking and brokerage, asset and wealth management, and corporate and investment banking products and services. Wachovia is headquartered in Charlotte, North Carolina and has branch offices in the United States and around the world. During the Class Period, Wachovia was registered with the SEC and filed annual, quarterly and other reports with the SEC.

#### 2.    Director Defendants

9.    The Wachovia Board of Directors (hereinafter the "Board") is the governing body of Wachovia under its charter, its bylaws, and applicable New York law. As is explained in more detail below, the Board had certain responsibilities with respect to the Plan, including appointment and oversight responsibilities, and the Board and its members were therefore fiduciaries of the Plan. The Board and its members listed above are referred to as the "Director Defendants." On information and belief the members of the Director Defendants during the Class Period included the following individuals.

10.    Defendant John D. Baker, II has served as a Director of Wachovia since 2001.

11.    Defendant Peter C. Browning has served as a Director of Wachovia since 2001.

12.    Defendant John T. Casteen, III has served as a Director of Wachovia since 2001.

13.    Defendant Jerome A. Gitt has served as a Director of Wachovia since 2006.

14.    Defendant William H. Goodwin, Jr. has served as a Director of Wachovia since 1993.

15.    Defendant Maryellen C. Herringer has served as a Director of Wachovia since 2006.

16.    Defendant Robert A. Ingram has served as a Director of Wachovia since 2001.

17.    Defendant Donald M. James has served as a Director of Wachovia since 2004.

18.    Defendant Mackey J. McDonald has served as a Director of Wachovia since 1997.

19.    Defendant Joseph Neubauer has served as a Director of Wachovia since 1996.

20.    Defendant Timothy D. Proctor has served as a Director of Wachovia since 2006.

21.    Defendant Ernest S. Rady has served as a Director of Wachovia since 2006.

22.    Defendant Van L. Richey has served as a Director of Wachovia since 2004.

23.    Defendant Ruth G. Shaw has served as a Director of Wachovia since 1990.

24.    Defendant Lanty L. Smith has served as a Director of Wachovia since 1987 and as Chairman of the Board of Directors of Wachovia since May 8, 2008. Defendant Smith has served as the Interim Chief Executive Officer since June 1, 2008.

25.    Defendant G. Kennedy Thompson served as the Chairman of the Board of Directors of Wachovia from 2003 until May 8, 2008, and as a Director from 1999 until his resignation effective June 1, 2008. Defendant Thompson also served as the Company's President and Chief Executive Officer until his resignation.

26.     Defendant Dona Davis Young has served as a Director of Wachovia since 2001.

### 3.    Management Resources and Compensation Committee Defendants

27.     On information and belief, the Management Resources and Compensation

Committee ("Compensation Committee") is appointed by the Board and had responsibility for

various oversight responsibilities over the Plan. The Defendants identified in this paragraph are

referred to as the "Compensation Committee Defendants." On information and belief, the

Compensation Committee Defendants during the Class Period are as follows:

       a.     Defendant Peter C. Browning;

       b.     Defendant Robert A. Ingram;

       c.     Defendant Mackey J. McDonald;

       d.     Defendant Timothy D. Proctor; and

       e.     Defendant Ruth G. Shaw.

### 4.    Wachovia Benefits Committee Defendants

28.     On information and belief, the Plan assigned certain fiduciary responsibilities and

duties to the Wachovia Benefits Committee ("Benefits Committee"), including the responsibility

for selecting the investment funds in the Plan and for monitoring the performance of those funds.

The Benefits Committee members also have full authority and power to administer and construe

the Plan.

29.     On information and belief, Defendant Benjamin J. Jolley served as Senior Vice

President, Wachovia Benefits Committee, during the Class Period.

30.     The identities of the remaining Benefits Committee Defendants are currently

unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 1-10. Once the

identities of the remaining Benefits Committee Defendants are ascertained, Plaintiff will seek

leave to join them under their true names. Defendant Jolley and John and Jane Does 1-10 are referred to collectively, as the "Benefits Committee Defendants."

### 5.    Human Resources Defendants

31.    On information and belief, the Plan assigned certain fiduciary responsibilities and duties to the Benefits Committee, which then delegated the responsibility to administer and construe the Plan to the Human Resources Division of Wachovia ("Human Resources Defendants").

32.    On information and belief, Defendant Shannon McFayden served as Head of Human Resources and Corporate Relations during the Class Period.

33.    The identities of the remaining Human Resources Defendants are currently unknown to Plaintiff and are therefore named fictitiously as John and Jane Does 11-20. Once the identities of the remaining HR Defendants are ascertained, Plaintiff will seek leave to join them under their true names. Defendant McFayden and John and Jane Does 11-20 are referred to collectively, as the "Human Resources Defendants."

### 6.    Additional "Doe" Defendants

34.    Without limitation, unknown "Doe" Defendants 21-40 include other individuals, including members of the Plan fiduciary committees, as well as other Company officers, directors and employees who are or were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period. The identities of these John and Jane Doe Defendants are currently unknown to Plaintiff; once their identities are ascertained, Plaintiff will seek leave to join them to the instant action under their true names.

## IV.    THE PLAN

35.    The Plan is an "employee pension benefit plan," as defined by § 3(2)(A) of ERISA, 29 U.S.C. § 1002(2)(A) and, further, is a "defined contribution plan" within the meaning

of ERISA § 3(34), 29 U.S.C. § 1002(34). The relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

36.    The Plan became effective on June 19, 1962. The Plan is sponsored by the Company and its subsidiaries. The purpose of the Plan is to "promote savings for retirement."

37.    Effective January 1, 1999, the portion of Plan invested in Wachovia Corp. Common Stock Fund was amended to be an Employee Stock Ownership Plan ("ESOP").

38.    During the Class Period, the assets of the Plan were held in trust by Wachovia Bank, National Association, pursuant to a trust agreement.

39.    At all relevant times, the Plan had two separate components: (1) a contributory component, which consisted of participant contributions, and (2) a matching component, ("Company Matching Contributions") which consisted entirely of employer contributions. Pursuant to the Plan, a full-time employee is eligible to participate in the Plan beginning on the first day of the month following the month in which they complete one full calendar month of service. All contributions made to the Plan constitute a form of deferred compensation.

40.    Participants in the Plan are permitted to defer a percentage of their base compensation for investment in the Plan. Participants in the Plan are allowed to contribute up to 30 percent of their eligible compensation.

41.    Throughout the Class Period, the Plan offered various investment options for participant contributions, including the Wachovia Corp. Common Stock Fund, for Plan participants employed by Wachovia, or one of its subsidies that is taxable as a corporation, and the Wachovia Stock Non-ESOP Fund, for Plan participants who are employed by an entity of the Company that is taxable as a partnership.

42.     Throughout the Class Period, the Company made Company Matching Contributions to the Plan.  Employees become eligible for Company Matching Contributions upon completing one year of service.  The percentage of Company Matching Contributions is determined annually by the Wachovia Human Resources and Corporate Relations Director, the Executive Vice President of Human Resources, and/or the Wachovia CEO, but cannot exceed six percent of a participant's eligible compensation.

43.     The first one percent of the Company Matching Contribution is made in Wachovia common stock and credited to a participant's account in either the Wachovia Corp. Common Stock Fund, for Plan participants employed by Wachovia, or one of its subsidiaries that is taxable as a corporation, or in the Wachovia Stock Non-ESOP Fund, for Plan participants who are employed by an entity of the Company that is taxable as a partnership.

44.     Participants are fully vested in their personal contributions and in the Company Matching Contributions at all times.

45.     On information and belief, the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund were not required features of the Plan.  Rather, whether to offer Wachovia common stock as an investment option in the Plan was a discretionary decision made by the Plan's fiduciaries, by and through the Benefits Committee Defendants and/or the Director Defendants.

46.     Nothing in the Plan limits the ability of the Plan's fiduciaries to remove the Wachovia Corp. Common Stock Fund and the Wachovia Stock Non-ESOP Fund as investment alternatives or divest assets invested in the options as prudence dictates.

8

## V.    DEFENDANTS' FIDUCIARY DUTIES

47.    Each of the Defendants was a fiduciary with respect to the Plan and owed fiduciary duties to the Plan and the participants and beneficiaries under ERISA in the manner and to the extent set forth in the Plan's documents, through their conduct, and under ERISA.

48.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

49.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

50.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, on information and belief, the Company chose to assign the appointment and removal of fiduciaries to the Monitoring Defendants named herein. These persons and entities in turn selected Wachovia employees, officers and agents to perform most fiduciary functions.

### A.    Wachovia

51.    Wachovia, at all applicable times, on information and belief, has exercised control over the activities of its employees that performed fiduciary functions with respect to the Plan and, on information and belief, can hire or appoint, terminate, and replace such employees at will. Wachovia is, thus, responsible for the activities of its employees through traditional principles of agency and *respondeat superior* liability.

9

52.    Additionally, under basic tenets of corporate law, Wachovia is imputed with the knowledge that the Defendants had regarding the misconduct alleged herein, even if not communicated to Wachovia.

53.    Wachovia was a *de facto* fiduciary of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

54.    Wachovia, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, on information and belief, Wachovia relied and continues to rely directly on the Director Defendants, the Compensation Committee Defendants, the Benefits Committee Defendants, the Human Resources Defendants and the other individual Defendants named herein to carry out its fiduciary responsibilities under the Plan and ERISA.

**B.    The Director Defendants**

55.    Under the Company's charter and bylaws, the Board had the authority to manage the business and affairs of the Company. Because the Company was, as alleged above, a fiduciary of the Plan during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of the Company.

56.    Moreover, the Director Defendants are charged with the appointment of following Plan fiduciaries: the Compensation Committee members and the Benefits Committee members. Accordingly, the Director Defendants had the duty to monitor, and to remove, the Compensation Committee Defendants and the Benefits Committee Defendants. Thus, the Director Defendants exercised a fiduciary function under ERISA.

57.    The Director Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**C.    The Management Resources & Compensation Committee Defendants**

58.    The Management Resources & Compensation Committee is a committee of the Board.  According to the Charter of the Management Resources & Compensation Committee, the Compensation Committee Defendants had various responsibilities, including the following duty:

> To review and make policy recommendations from time to time with respect to various benefit plans for the Corporation's employees, including the pension and savings plans, groups insurance plans, and such other plans as the Committee may from time to time deem advisable and appropriate, and, at the Committee's discretion, convey appropriate administrative authority to the Corporation's management of such plans…

Charter of the Management Resources & Compensation Committee at 3.

59.    The Compensation Committee was to report the information from its activities to the Board and, where appropriate, its recommendations for action by the Board.

60.    The Compensation Committee Defendants were *de facto* fiduciaries of the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### D.    The Wachovia Benefits Committee Defendants

61.    The Benefits Committee is responsible for the selection of the investment options offered under the Plan and, therefore, the Benefits Committee is a "named fiduciary" of the Plan for investment purposes as that term is defined under ERISA.

62.    The Benefits Committee is also the "Administrator" of the Plan. However, it has delegated the responsibility for the administration, daily operation and interpretation of the Plan to the Human Resources Division of Wachovia. Consequently, the Benefits Committee Defendants had the duty to monitor, and to remove, the Human Resources Defendants. Thus, the Benefits Committee Defendants exercised a fiduciary function under ERISA.

63.    The Benefits Committee Defendants were both named fiduciaries of the Plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), in that they exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### E.    The Human Resources Defendants

64.    The Human Resources Defendants were delegated the duties of the administration, daily operation and interpretation of the Plan by the Benefits Committee. The Human Resources Defendants were therefore the "Administrator" with respect to the Plan, as that term is defined in ERISA § 3(16)(A).

65.    On information and belief, in order to comply with ERISA, the Human Resources Defendants exercised responsibility for communicating with participants regarding the Plan in a plan-wide, uniform, mandatory manner, by providing participants with information and materials required by ERISA. In this regard, on behalf of the Company, the Human Resources Defendants

disseminated the Plan documents, such as the SPD, and related materials which, among other things, incorporated by reference Wachovia's misleading SEC filings, thus converting such materials into fiduciary communications.

## VI.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

66.    During the Class Period, the Company heavily invested in, and made risky, subprime loans that carried serious risks to the value of Company stock. Defendants were also aware of numerous other business risks, such as the Company's involvement in the auction-rate securities market, or potential liability arising from government investigations into fraud and money laundering involving the Company.

67.    Although Defendants knew or should have known of these risks, they did not advise Plan members of them and, to the contrary, tried to hide the Company's financial difficulties and risks and misrepresented to Plan members, and the world, that the Company was financially healthy, that the Company employed "conservative" underwriting standards, and that the Company's loans were not subject to the same dangers that other subprime lenders suffered during this time. In fact, however, the Company's mortgage portfolio consisted of billions of dollars worth of subprime loans with impaired value; the Company held risky securities, many of which it knew or should have known were backed by dangerous subprime loans; and the Company did not employ sound underwriting practices, such as requiring proper documentation for loans.

68.    As a result of the aforementioned facts and conduct, Defendants knew or should have known that Company stock was not a prudent investment for Plan members. Even though Defendants knew or should have known these facts, and even though Defendants knew of the high concentration of the Plan's funds in Company stock, they still failed to inform Plan participants about the risks of Company stock and disseminated inaccurate, incomplete and

materially misleading statements Plan-wide regarding the Company's financial and operational

health and future prospects, and/or did nothing to correct such statements.

**A.    The Company's Heavy Involvement in Subprime Lending**

**1.    Subprime Lending**

69.    Subprime mortgage lending is defined as the practice of issuing high-interest or

variable interest loans to customers with impaired or non-existing credit histories, who otherwise

would not qualify for loans from mainstream lenders.

70.    Typically, subprime borrowers have relatively low credit scores along with little

or no money to apply to a down-payment on a home.  Subprime borrowers also include

borrowers who have had recent bankruptcies or credit delinquencies, or are trying to borrow a

large amount of money relative to their income or the value of the home they seek to acquire.

These individuals would usually be excluded from the mortgage market and, accordingly, would

not have mortgages included in the secondary market.

71.    According to an article in *USA Today* on December 7, 2004, subprime mortgage

lenders "offer products from fixed-rate mortgages to interest-only loans, where borrowers pay

just the interest for a set number of years, or 80-20 loans, in which borrowers finance a home

with an 80% mortgage at one rate and the remaining 20% through a second loan." *USA Today*,

"Subprime Loan Market Grows Despite Troubles," December 7, 2004.

72.    Subprime mortgage loans represent a greater risk to lenders than prime mortgage

loans.  These risks were multiplied by the non-traditional loan products that subprime lenders,

including the Company, began offering to try to capture new customers.

73.    One example of these products was Adjustable Rate Mortgages ("ARMs").  These

were mortgages with interest rates that usually increased over time.  One popular version was the

2/28 ARM.  These were 30-year loans that began with a two-year depressed "teaser" rate,

followed by a 28-year higher rate (most often a rate pegged to market interest rates). These loans carried a high risk of default because after two years, the borrower's monthly payments dramatically increased. They also carried a substantial "prepayment penalty," which made it difficult for borrowers to refinance the loan.

74.     Pay Option ARMs were another example of these products. Pay Option ARMs enabled the borrower to defer paying on the loan, or permitted the borrower to pay only part of the interest on the loan for an initial period. The unpaid interest would be added to the principal. These are also called negative amortization loans. They carry a high risk of default because like ARMs, they lead to surprising, higher monthly payments for the subset of borrowers that is at the highest risk of default in the first place.

75.     Two other such products were "No Doc" and/or "Low Doc" Loans. These were loans made without documentation of the borrower's financial status, assets, credit history, and/or earning power – obviously risky loans, especially when made to the group of borrowers most likely to default on loans in the first place.

76.     Two other such products were Home Equity Lines of Credit and 100% Financing Loans. Whereas a borrower ordinarily needs to put 20% down on a home, these products enabled borrowers to obtain a second loan to cover the 20%. These were second mortgage loans, secured by the difference between the value of the home and the amount of the first mortgage. They were risky because if property values went down (as they eventually did), the second mortgage holder had no collateral.

77.     All of these loan products, by their very nature, were fraught with significant risk of default. They were doubly risky since they were targeted at the subprime market, _i.e._, the least sophisticated consumers, with the lowest credit ratings, lowest income, and highest

probability of default. To make matters worse, many lenders decreased the minimum credit scores necessary for borrowers to obtain subprime loans, and lessened other underwriting standards as well.

78.    As early as 2004, a number of industry commentators began expressing concerns about the increased risks associated with the burgeoning subprime lending industry.

79.    Upon information and belief, many mortgage lenders intentionally steered borrowers into high-cost, unsuitable subprime loans. For instance, in 2006, $600 billion in mortgages, or 20% of the total mortgage originations, were subprime loans as compared with $40 billion in Federal Housing Administration ("FHA")-insured loans, which are typically less costly for borrowers, but less profitable for lenders. Further, FHA loans generally require borrowers to supply extensive documentation and therefore take much longer to secure approval. Evidence strongly suggests that lenders sought to profit on higher margin subprime mortgages by making subprime adjustable rate mortgages, even when borrowers could qualify for a loan through the FHA program. For example, *TheStreet.com* reported, as of April 2007, that "under current FHA requirements, approximately 18% of the 'pre-reset' subprime adjustable-rate mortgages, including those originated last year, could qualify for an FHA loan." *TheStreet.com*, "Subprime Swoon Sparks an FHA Revival," April 30, 2007.

80.    Rather than hold mortgage loans, lenders generally sell subprime mortgages to be bundled into bonds and offered to individual and institutional investors. Mortgages are sold by lenders to the secondary market, and then pooled, securitized and sold to investors as mortgage-backed securities. The money that the lender receives for the sale of the mortgages on the secondary market is then used to fund new mortgages – increasing the lender's profits and,

typically, boosting its stock price.  Because the loans are sold, underwriting practices are often

de-emphasized and, in some cases, not followed at all.

81.    As home prices declined and interest rates began to rise in late 2006 and early

2007, the default rates for subprime mortgages rose as well.  For example, early defaults in these

mortgages (within the first six months of securitization) rose from between the .5% to .75%

range in 2003-2004 to over 2.5% in 2006, as reflected in the chart below:



Source: The New York Times, "Tremors at the Door," January 26, 2007.

82.    Beginning in early 2006, many securities analysts and economic commentators

began expressing growing concern about the effect that falling real estate values and rising

interest rates would have on lenders, such as the Company, that profited from making risky

loans.

17

83.     The substantial increase in mortgage loan defaults had a tremendous impact upon the mortgage market.  During the first half of 2007, dozens of lenders participating in the subprime mortgage market went out of business as defaults and delinquencies on recent loans spiked.

### 2.     The Company's Heavy Origination of Subprime Loans

84.     Despite warnings from industry analysts, the Company continued to grow its risky investments in the subprime industry during the Class Period.

85.     In October 2006, Wachovia acquired adjustable-rate-mortgage lender Golden West Financial Corp. ("Golden West"), and its massive portfolio of risky subprime loans, for **_$25.5 billion_**.  (Wachovia Press Release May 7, 2006 "Wachovia To Acquire Golden West Financial, Nation's Most Admired And 2nd Largest Savings Institution.")

86.     Golden West's main product was called Pick-a-Pay.  This product allowed the borrower to pick certain terms of repayment.  One option was for the borrower to pay interest only for a period of time without paying down any of the principal.  Another option was for the borrower to pay only part of the interest, while the remainder was tacked on to the principal, _i.e._, a negative amortization loan.  As of December 31, 2007, Pick-a-Pay loans comprised 46% of the Company's consumer loans and 25% of the Company's overall loans.

87.     Following the acquisition of Golden West, the Company continued to originate Pick-a-Pay and other subprime loans.

### 3.     Collateralized Debt Obligations

88.     Generally speaking, collateralized debt obligations ("CDOs") are pools of bonds, loans and other asset-backed securities.  After mortgages are written, investment banks pool them together and use the cash flows they produce to pay off mortgage-backed bonds, which are underwritten by investment banks.  The mortgage bonds, in turn, are often packaged again into

18

CDOs and sold to investors in slices. In 2006, CDOs soaked up an estimated $150 billion of mortgage-backed bonds, the vast majority of which were underpinned by subprime mortgages. It usually takes several months to assemble a portfolio of bonds before a CDO can raise money from investors by issuing securities of its own. During the "ramp-up" period, CDO managers -- typically big money managers -- work with a Wall Street bank to buy and collect the securities that will be bundled together. The bank often bears the risk of short-term fluctuations in prices of the bonds prior to the sale of the CDO. Serena Ng and Michael Hudson, *Mortgage Shakeout May Roil CDO Market, The Wall Street Journal*, March 13, 2007.

89.     The Company was deeply invested in CDOs and other subprime mortgage-backed securities. By 2007, it was one of the largest CDO managers in the nation.

90.     The problems in the subprime mortgage industry led investors to demand much higher returns on CDOs they purchased, which had the impact of making them more difficult to sell and drove down prices. Despite the fact that most investment banks recognized the warning signs and reduced their exposure to CDOs, the Company failed to take adequate measures to address or limit its exposure to losses resulting from its substantial position in the subprime mortgage market. When the subprime mortgage market collapsed, the Company found itself holding a substantial amount of debt that investors were not interested in purchasing. Even in the midst of the brewing subprime crisis, the Company refused to admit its vulnerability, as described in further detail below.

**B.     The Company's Dissemination of Materially Inaccurate, Incomplete and Misleading Information to Plan Participants**

91.     Throughout the Class Period, Defendants repeatedly issued inaccurate, incomplete and materially misleading statements to investors and to the Plan's participants, particularly regarding the following: (1) that the Company was grossly over-exposed to the potential for

substantial losses as conditions in the subprime industry deteriorated; (2) that the Company's

merger with Golden West resulted in significant exposure due to the massive number of

subprime loans the Company assumed, and continued to make; (3) that the Company concealed

the dangers it faced as a result of its huge exposure to CDOs; (4) that the Company failed to take

accurate and timely write-downs for losses resulting from the collapse of the subprime market;

(5) that the Company's statements about its financial well-being and future business prospects

lacked in any reasonable basis when made, and (6) that the Company's repeated assurances

about the quality of its loans and underwriting practices were false.

92.     The Company's dissemination of inaccurate, incomplete and materially

misleading statements prevented the market and Plan participants from realistically assessing the

Company and its financial wellbeing, thus resulting in the overvaluation and artificial inflation of

its stock.  Defendants further knew or should have known that the Company's stock price would

plummet, and that Plan participants would suffer tremendously and unnecessarily, once the truth

became known.

93.     Nonetheless, throughout the Class Period, the Company fostered a positive image

to assure the market and Plan participants that the Company would not fall prey to adverse trends

in the credit industry – particularly, the subprime mortgage industry.

**1.    The Company Misrepresented Its Risks and Underwriting Practices**

94.     On May 8, 2006, Wachovia held a conference call to discuss its acquisition of

Golden West.  On the conference call announcing the acquisition, Defendant Thompson stated,

among other things, that Golden West was "obsessed with conservative underwriting."  He

further represented that Golden West had "an elegantly simple option ARM product that is low

risk because of, number one, the product features their option ARM and two, because of their

rigorous underwriting process."

95.    At a conference call on May 16, 2006, Thompson stated the Company's plan to "originate Golden West's conservative option ARM products on the East Coast." In response to questions about the growing negative amortization in Golden West's portfolio, Thompson stated: "I'm not concerned because of the conservative underwriting standards that the company has."

96.    On November 3, 2006, the Company filed its quarterly report (10-Q) with the Securities and Exchange Commission ("SEC"), which was signed by Defendant Thompson. The Company reported $7.04 billion in revenues for the third quarter of 2006. It further represented: "We continue to mitigate risk and volatility on our balance sheet by actively monitoring and reducing potential problem loans, including their sale, when prudent."

97.    In an earnings conference call on January 23, 2007, Defendant Thompson stated: "we feel really good about our credit quality."

98.    On January 23, 2007, Wachovia issued a press release claiming "double-digit growth in face of difficult interest environment." Wachovia further boasted:

- Continued strength in credit quality; increased provision reflects growth in auto, commercial lending and credit card.

- Average loans up 74 percent, including acquisitions, with strength in commercial lending and consumer real estate-secured.

The press release further stated that Wachovia "[g]rew revenue 31 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp, with equally strong fee income growth."

99.    On February 28, 2007, the Company filed its annual report (10-K) with the SEC. The report stated: "We are optimistic about our outlook for credit quality as we enter 2007 given

the highly collateralized nature of our loan portfolio. While we expect modest increases in credit costs, we believe overall credit quality will remain strong."

100.   On April 16, 2007, Wachovia issued a press release once again claiming "double-digit growth in face of difficult interest environment." Wachovia further boasted of its "solid credit quality" and stated that Wachovia "[g]rew revenue 17 percent on higher loans and deposits primarily due to the addition of Golden West and Westcorp."

101.   In an earnings conference call on April 16, 2007, Defendant Thompson stated "we feel confident about the superior quality of our mortgage portfolio." In response to inquiries as to whether the Company would face problems from its subprime practices, Thompson replied that "it does not affect us. And I think that goes to the very conservative underwriting standards and servicing standards that the Sandlers implemented at Great West." His assurances were echoed by Chief Financial Officer Thomas Wurtz, who added: "One thing I can tell you is that we won't stretch for earnings by altering the Golden West origination system or weakening their proven credit practices." The Company's Chief Risk Officer Donald Truslow reiterated: "As we've talked about before, the Golden West loans are very conservatively underwritten at low loan to values with particular attention paid to the quality of appraisals ... our view of the Golden West underwriting practices has just continued to grow stronger."

102.   On May 4, 2007, the Company filed its 10-Q with the SEC. In commenting on its management of credit risk the 10-Q stated:

> The low level of net charge-offs reflects a continuing solid credit environment, the highly collateralized nature of our loan portfolio and our careful management of the inherent credit risk in our loan portfolio. The Golden West portfolio has a long record of extremely low net charge-offs, including virtually none in the past eight years, reflecting strong underwriting and credit risk management.

103.    On June 12, 2007, Wachovia issued a "Mortgage Update" by Rich Fikani, Russ Kettell, and David Pope.  Page 4 discusses the "Pick-a-Pay" Pay Option ARM offered by the Company.  Under "Underwriting," it states:

- "Common sense" customer credit analysis

  o Not a "Black Box," FICO driven credit scoring model and approval process

- Diligent and methodical documentation standards

- Borrowers always qualified at the fully indexed rate

- Underwriters incented on quality of their underwriting (via audits), customer service and contribution to company (training staff, etc.)

104.    On June 30, 2007, Wachovia issued a Midyear 2007 Investor Update, which claimed that "All four of our businesses delivered double-digit earnings growth."

105.    On June 30, 2007, Wachovia issued an "Investor Fact Book 1st Half 2007." Therein, Wachovia touted its "Low Risk Profile" in which "99% of [its] consumer loan portfolio is secured by collateral or is guaranteed" and its "Superior Risk Management."  It claimed "to mitigate risk by actively monitoring and reducing potential loan problems."  It further stated: "Excellent Credit Quality:  WB has the best record on charge-offs among the 10 largest banking companies in the nation."

106.    On July 20, 2007, Wachovia issued a press release once again proclaiming its "double digit growth in earnings" in the second quarter of 2007.  In specific, it boasted of:

- "Record revenue driven by higher loans and deposits"

- "Average loans up 53 percent, driven by higher consumer real estate loans related to Golden West acquisition"

- "Solid credit quality; increased provision largely reflects growth in auto, commercial, and consumer real estate loans and credit card."

107.    At an earnings conference call on July 20, 2007, the Company's Chief Risk Officer Donald Truslow stated that the Company was not impacted by the subprime meltdown. He stated "we view the risk to Wachovia [sic] what's currently happening is very modest." He further explained: "As for subprime in our Capital Markets business ... *we've actively managed our business to minimize our exposure to the subprime market. So as a result there's been little impact to our businesses with the turbulence in the subprime markets and we don't anticipate any meaningful potential impact to earnings from subprime going forward.*" He further assured that "*because of the way these loans [Pick-a-Pay] are underwritten, we're not seeing any meaningful increases in losses in the portfolio and we don't expect to see any rises and losses as we look forward over the next few quarters and so the underwriting process and how these things are booked and what we're ultimately relying upon holding up very well as expected.*"

108.    On July 30, 2007, the Company filed its 10-Q for the second quarter of 2007 with the SEC. The Company represented: "Our consumer real estate portfolio has a long record of relatively low net charge-offs, reflecting strong underwriting and credit risk management."

109.    The foregoing representations were false and/or misleading because they did not disclose the risks that the Company faced from its increasingly large portfolio of risky subprime loans; did not reveal the Company's poor underwriting practices, such as "no doc" and "low doc" loan-making; did not reveal that the Company's profits were falsely inflated from a failure to account for loan loss; did not reveal that the Company's increased "revenue" was due to

aggressively originating risky loans, even in the face of known risks and worsening marketing conditions; and boasted of "high credit quality" when in fact, just the opposite was true.

### 2. The Company Continued to Misrepresent Its Subprime Exposure, Even While Writing Down Losses

110.    Throughout autumn 2007, the stock prices of many large lenders/investment banks dropped significantly. This was due to the immense problems within the subprime mortgage industry, as hundreds of millions of dollars worth of subprime mortgage-backed securities became virtually worthless and numerous lenders announced substantial mortgage-related charges. Nevertheless, and despite the Plan's heavy investment in Company stock, the Company continued to deny the truth about its financial condition.

111.    On October 19, 2007, Wachovia issued a press release. It stated: "Revenue growth led by a 28 percent in net interest income, including Golden West, coupled with disciplined expense control partially offset lower fee income." The press release further stated: "Average loans up 53 percent, driven by higher consumer real estate loans related to the Golden West acquisition, and strong organic growth in commercial, international and auto lending." The press release further stated: "Net charge-offs rose 3 basis points to an annualized 0.19 percent of average net loans. Increased provision for credit losses reflects modest deterioration in credit quality, a more uncertain credit environment and loan growth. Higher nonperforming assets largely related to Golden West consumer real estate NPAs and to higher commercial real estate NPAs largely related to downgrades of residential developers."

112.    At a conference call about third quarter earnings on October 19, 2007, Defendant Thompson admitted: "I think the biggest disappointment for me is that of those $1.3 billion marks, we had about $300 million, roughly $300 million in losses on AAA subprime paper that

was in trading desks or in inventory." Following this disclosure, the Company's stock fell 3.61%.

113.    On November 9, 2007, the Company filed its 10-Q for the third quarter of 2007. It listed its risk exposure to subprime-backed securities as $2.05 billion. Despite the crashing subprime market, the Company stated: "While our outlook indicates a rise in the overall level of charge-offs at this point in the credit cycle, we believe the well collateralized nature of our real estate-secured portfolio, our careful management of inherent credit risk and strong underwriting will position us relatively well in a more uncertain credit environment."

114.    On November 9, 2007, the Company's Chief Risk Officer, Donald Truslow, stated that Wachovia's remaining exposure was "fairly modest." (*Charlotte Business Journal*, "Wachovia: Subprime Exposure Modest," November 9, 2007.) On November 9, 2007, Wachovia's stock traded at $40.65 per share; at present, it trades at $16.61.

115.    On January 22, 2008, the Company issued a press release, which once again failed to acknowledge its deep subprime lending problems. It claimed that: "Lower earnings largely reflect the effect of continued disruption in the capital markets, which resulted in net valuation losses of $1.7 billion as well as a provision for credit losses of $1.5 billion, which exceeded net charge-offs by $1.0 billion."

116.    On February 28, 2008, the Company filed its 10-K for 2007. Once again, the Company represented: "While our outlook indicates a rise in the level of charge-offs at this point in the credit cycle, we believe the well-collateralized nature of our real estate-secured portfolio, our careful management of credit risk and strong underwriting position us relatively well in this credit environment." In the report, the Company reported allowances for loan losses of $4.51 billion for the end of fiscal year 2007. It acknowledged that the loan loss provision

expense "in the first half of 2008 is likely to exceed 75 basis points of average net loans on an annualized basis." Following this news, the Company's stock fell 10.2% over the next two days.

117.    At a Deutsche Bank conference call on March 12, 2008, the Company's Chief Risk Officer Donald Truslow continued to maintain the integrity of the Company's Pick-a-Pay product. He stated: "The Pick-A-Pay non-accrual loan levels are up, but compared with some recently reported results by some other option ARM lenders in the industry, we believe our levels sit at relatively attractive levels, or levels pretty significantly below what we have seen some others report. I think that is probably due very heavily to the way Pick-A-Pay product is designed, and we are somewhat insulated from the recast pressure that some other option ARMs lenders are facing right now."

### 3.    The Truth Is Revealed

118.    On April 14, 2008, the Company reported a $350 million loss and undertook emergency measures to increase capital. At the same time, the Company increased its credit loss reserves by $2.8 billion, which included $1.1 billion specifically related to Pick-a-Pay. It further announced that it expects to experience additional net charge-offs and reserve building in its Pick-a-Pay portfolio of $3.2-3.8 billion in 2008 and $2.4-2.8 billion in 2009.

119.    In order to shore up its capital, the Company announced that it was going to reduce its dividend 41% to $0.375 and raise capital by $7-8 billion through public offerings. Shares fell from $27.81 to $25.55 on abnormally high volume. Since that time shares have plummeted to $16.61.

### C.    Defendants Failed to Provide Plan Participants with True and Accurate Information about Company Stock and Had Conflicts of Interest

120.    For the reasons set forth above, at all relevant times, Defendants knew or should have known that Company stock was an imprudent investment for the Plans and the Plans'

participants, and that Company stock was trading at artificially inflated values as a result of Defendants' misstatements and omissions. As a result of Defendants' knowledge of and, at times, involvement in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in the Company's stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

121.   Defendants failed to inform Plan participants with complete and accurate information about the true risks and value of Company stock, which were known or should have been known to Defendants.

122.   Defendants also failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans and, in connection therewith, failed to provide the Plans' participants with information regarding the Company's deep-rooted problems so that participants could make informed decisions regarding whether to divest their Company stock in the Plans and invest in the alternatives provided in the related 401(k) plans.

123.   An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plans in Company stock, under these circumstances, was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants against unnecessary losses, and would have made different investment decisions.

124.   Because Defendants knew or should have known that Company stock was not a prudent investment option for the Plans, they had an obligation to protect the Plans and their participants from the unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Company stock.

125.    Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plans of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plans; and/or resigning as fiduciaries of the Plans to the extent that, as a result of their employment by the Company, they could not loyally serve the Plans and their participants in connection with the Plans' acquisition and holding of Company stock.

126.    Despite the availability of these and other options, Defendants put the interests of the Company above the interests of the Plan by failing to take any action to protect participants from losses resulting from the Plans' investment in Company stock.  In fact, Defendants chose to continue to allow heavy investment of the Plans' assets in Company stock even as the Company's problems came to light, and elected not to perform investigations and/or take other appropriate steps to protect the Plan.

## VII.    CLASS ACTION ALLEGATIONS

127.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan, at any time between May 8, 2006 through the present (the "Class Period") and whose Plan accounts included investments in the Company's stock.

128.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are several

thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in the Company's stock.

129.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the Plan and members of the Class have sustained damages and, if so, the proper measure of damages and/or remedy.

130.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff, the Plan and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

131.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

132.    Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter,

be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

133.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## COUNT I

**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405)**

134.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

135.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136.    Defendants were responsible for ensuring that investment options made available to participants under the Plan were prudent. Defendants were responsible for ensuring that assets within the plan were prudently invested. Defendants were responsible for ensuring that all investments in the Company stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

137.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew or should have known that the Company stock was not a suitable and appropriate investment for the Plan as described herein. Investment in the Company stock during the Class Period did not serve the Plan's purpose of helping participants

save for retirement, and in fact caused significant losses/depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue from investment in Company stock. Moreover, Defendants had a duty to put in place a financial strategy to address the subprime loan problems, rather than ignoring and hiding them. Defendants failed to implement such a strategy.

138.    Defendants also breached their co-fiduciary obligations by, among their other failures: knowingly participating in, or knowingly undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the Company's operations, business practices, and artificial inflation of the price of the Company stock. Defendants knew or should have known of such breaches by Plan fiduciaries, yet made no effort to remedy the same.

139.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly, Plaintiff and the Plan's other participants and Beneficiaries, lost a significant portion of their value and retirement investment.

140.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## COUNT II

**Failure to Provide Complete and Accurate Information
to the Plan's Participants and Beneficiaries by all Defendants
(Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 of ERISA)**

141.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    At all relevant times, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.§ 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

143.    At all relevant times, the scope of Defendants' fiduciary responsibilities included making Plan-related communications and material disclosures. As part of these obligations, Defendants had a duty to provide Plan participants with information they possessed about Plan assets and information that they knew or should have known would have an impact on the Plan.

144.    The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of keeping or divesting, to the extent possible, their Company stock investments in the Plan. This duty applies to all of the Plan's investment options, including investment in Company stock.

145.    Defendants knew that investment in Company stock carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important.

146.    Defendants breached their duty to inform participants by issuing false and misleading statements regarding the value of Company stock and the financial health of the Company, and by failing to provide complete and accurate information regarding, *inter alia*, the Company's risks due to subprime loans, the Company's risks due to its own poor underwriting

practices, the Company's understatement of its reserves, and Defendants' concealment of the same and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's future outlook. In addition, Defendants failed to disclose any information to Plan participants regarding the Company's deceitful business practices and how those practices adversely affected the value of Company stock as a prudent option under the Plan. These failures were particularly devastating to the Plan and their participants; losses in this investment had an enormous impact on the value of participants' retirement assets, as a significant percentage of the Plan's assets were invested in Company stock.

147. These actions and failures to act were uniform and caused the Plan, and/or the participants and beneficiaries of the Plan, to continue to make and maintain substantial investments in Company stock in the Plan at a time when these Defendants knew or should have known that the Plan's participants and beneficiaries did not have complete and accurate information concerning their investments. Plaintiff and the Class relied to their detriment on these Defendants' incomplete, inaccurate and materially misleading statements regarding the performance and future health of Company stock.

148. Defendants are also liable as co-fiduciaries because (1) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide complete and accurate information regarding the Company stock, despite knowing of their breaches; (2) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (3) they had knowledge of, or should have known of, the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to participants, yet did not make any effort to remedy these breaches.

149.    Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant of the Plan that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his detriment. Here, the above-described statements, acts and omissions of the Defendants constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in the Company stock and were material to any reasonable person's decision whether to maintain any part of his or her invested assets of the Plan in the Company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

150.    As a direct and legal consequence of these Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses. If the Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

151.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### Failure to Avoid Conflicts of Interest
### (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405)

152.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

153.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

154.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

155.    Through the conduct alleged herein, Defendants put themselves in the inherently conflicted position of having to choose between their duties to loyally serve the interests of Plan participants and the interests of others, including themselves. Through the conduct alleged herein, Defendants placed the interest of the Company before the interests of Plan participants, in violation of their fiduciary duties under ERISA.

156.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; failing to notify federal agencies of the facts that made the Company stock an imprudent investment for the Plan; failing to take other steps to ensure that Plan participants' interests were loyally served; and otherwise placing their own and the Company's interests above the interests of the participants with respect to the Plan' investment in the Company's securities.

157.    As a direct and legal consequence of Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses. If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary

duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

158.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count

## COUNT IV

### Failure to Adequately Monitor Other Fiduciaries and Provide Them with Accurate Information (Breaches of Fiduciary Duties in Violation of ERISA § 404)

159.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

160.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

161.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Defendants included the responsibility to appoint, evaluate, and monitor other fiduciaries.

162.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that the monitoring fiduciaries, the Company and the Individual Defendants, had the duty to:

(1)    Ensure that the monitored fiduciaries possessed the needed credentials and experience, used qualified advisors and service providers to fulfill their duties, and were knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(2)    Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(3)    Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(4)    Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(5)    Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investment options; and

(6)    Ensure that the monitored fiduciaries regularly reported to the Company and/or the Director Defendants, and then reviewed, understood, and approved the conduct of the hands-on fiduciaries.

163.    A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's assets, and must take prompt and effective action to protect a plan and its participants when they arc not.  In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

164.    Defendants breached their fiduciary monitoring duties by, inter alia (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business problems alleged above, which made Company stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in an undiversified employer stock fund that was made up primarily of Company stock, an investment that was

imprudent and subject to inevitable and significant depreciation, especially where, as here, the stock price was artificially inflated by Defendants' own wrongful conduct.

165.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were imprudently continuing to invest the assets of the Plan in Company stock when it no longer was prudent to do so. Despite this knowledge, Defendants failed to take action to protect the Plan, and concomitantly the Plan's participants, from the consequences of these fiduciaries' failures.

166.    In addition, Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of the Company that they knew or should have known these Defendants needed to make sufficiently informed decisions. By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties under the Plan and ERISA.

167.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries; they enabled the breaches by these Defendants; and they failed to make any effort to remedy these breaches, despite having knowledge of them.

168.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plaintiff and the Plan' other participants and beneficiaries, lost a significant portion of their retirement investments.

169.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    A Declaration that the Defendants, collectively and separately, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets; to restore to the Plan all profits the Defendants made through use of the Plan's assets; and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.    An Order enjoining Defendants from further breaching their fiduciary duties under ERISA;

E.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan participants' individual accounts in proportion to the accounts' losses;

G.    An Order that Defendants allocate the Plan' recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of the Company maintained by the Plan, in proportion to the accounts' losses attributable to the decline in the stock price of the Company;

H.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.    An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

J.    An Order for equitable restitution and other appropriate equitable monetary relief

against the Defendants.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

DATED:  June 19, 2008                        Respectfully Submitted,


                                             ALLEGAERT BERGER & VOGEL LLP


                                             By: _____ (CM 3544)
                                                   Cornelius P. McCarthy (CM-3544)
                                             111 Broadway, 20th Floor
                                             New York, New York 10006
                                             Telephone:  (212) 571-0550
                                             Facsimile:  (212) 571-0555
                                             Email:  cmccarthy@abv.com


                                             and


                                             LINER YANKELEVITZ SUNSHINE &
                                             REGENSTREIF LLP
                                             Ronald S. Kravitz
                                             199 Fremont Street, 20th Floor
                                             San Francisco, CA  94105-2255
                                             Telephone:  (415) 489-7700
                                             Facsimile:  (415) 489-7701
                                             Email:  rkravitz@linerlaw.com


                                             *Attorneys for Plaintiff and Proposed Class*